# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| SKILLMASTER STAFFING SERVICES, INC., | § § § | |
| Plaintiff, | § § | |
| VS. | § § | CIVIL ACTION NO. H-04-3619 |
| J.M. CLIPPER CORP., | § § | |
| Defendant. | § § | |

## MEMORANDUM AND OPINION

Plaintiff, SkillMaster Staffing Services, Inc. ("SkillMaster"), a staffing company, hired Ernest Morales and assigned him to work at Acadia Elastomers Corporation's J.M. Clipper plant in Deer Park, Texas. Morales was injured while working as a machine operator at the plant. SkillMaster paid Morales workers' compensation benefits. SkillMaster sued Acadia in state court, seeking to recover the benefits paid to Morales and other damages. SkillMaster asserted causes of action for negligence, negligent misrepresentation, unjust enrichment, fraud, malice, and breach of contract. Acadia removed to federal court on the basis of diversity. Acadia has moved for summary judgment, asserting that Morales was its employee and that SkillMaster's claims are barred under the exclusive-remedy provisions of the Texas Workers' Compensation Act, Tex. Lab. Code § 408.001. (Docket Entry No. 18). SkillMaster has responded. (Docket Entry Nos. 19, 20). Acadia has replied and moved to strike an affidavit SkillMaster submitted as part of the summary judgment evidence. (Docket

Entry Nos. 23, 24).  SkillMaster has responded to the motion to strike.  (Docket Entry No. 25).

Based on the pleadings; the motion, response, and reply; the parties' submissions; and the applicable law, this court denies Acadia's motion to strike and grants in part and denies in part Acadia's motion for summary judgment.  The reasons are explained below.

## I.    Background

SkillMaster hired Morales in October 2003 and assigned him to work at Acadia's J.M. Clipper plant in Deer Park, Texas.  (Docket Entry No. 18, Ex. 3 at 1).  Acadia placed Morales in the plant's TDI shop, operating a gasket press.  (Docket Entry No. 18, Ex. 4 at 2).  In this suit, SkillMaster alleges that Acadia sought and paid for a "general laborer" for the position Morales was hired to fill.  Instead, Acadia used Morales as a gasket press operator, which requires a worker qualified as a machine operator and pays on a higher scale than a general laborer.  (Docket Entry No. 1, Original Pet.).

On November 19, 2003, Morales was operating the gasket press when his left arm was caught in the machine and crushed.  The injury resulted in the amputation of his arm below the elbow.  (*Id.*).  SkillMaster maintains workers' compensation insurance but is self-insured up to $500,000.  (*Id.*).  In this suit, SkillMaster seeks to recover the money it paid Morales in workers' compensation benefits and seeks damages, including damages for providing a general laborer for a skilled position.  (Docket Entry No. 1, Original Pet.).  In its summary judgment motion, Acadia argues that Morales was its employee and covered by its workers' compensation policy, barring SkillMaster's claim under the exclusive-remedy provisions of

2

the Texas Labor Code § 408.001.  SkillMaster denies that it is barred from recovering against Acadia for negligence or other claims.

This court granted summary judgment for Acadia in a related case, *Morales v. Acadia Elastomers Corp.*, No. 04-3401, on July 15, 2005.  In that case, this court concluded that Morales was an Acadia as well as a SkillMaster employee and that Morales's claims against Acadia were barred by the exclusive-remedy provisions of the Texas statute.  The summary judgment record in that case is different from the present case.  The record in *Morales* included extensive deposition testimony, including Morales's own testimony, not included in this record.  The record in *Morales* did not include a copy of the contract between Acadia and SkillMaster that is included in this record, and neither party in *Morales* raised the existence of such a contract.  This case also differs from *Morales* in that SkillMaster alleges claims that do not derive from Morales's negligence claims against Acadia, including breach of contract and related fraud claims.  The summary judgment claims and record in this case are, however, analyzed against many of the same legal standards that applied in the related lawsuit.

## II.     The Summary Judgment Standard

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  *See* FED. R. CIV. P. 56.  Under Rule 56(c), the moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322

3

(1986); *Stahl v. Novartis Pharms. Corp.*, 283 F.3d 254, 263 (5th Cir. 2002). If the burden of proof at trial lies with the nonmoving party, the movant may either (1) submit evidentiary documents that negate the existence of some material element of the opponent's claim or defense, or (2) if the issue is one on which the opponent will bear the ultimate burden of proof at trial, demonstrate the evidence in the record insufficiently supports an essential element or claim. *Celotex*, 477 U.S. at 330. The party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, but need not negate the elements of the nonmovant's case. *Bourdeaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005). "An issue is material if its resolution could affect the outcome of the action." *Weeks Marine, Inc. v. Fireman's Fund Ins. Co.*, 340 F.3d 233, 235 (5th Cir. 2003) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). If the moving party fails to meet its initial burden, the motion for summary judgment must be denied, regardless of the nonmovant's response. *Baton Rouge Oil & Chem. Workers Union v. ExxonMobil Corp.*, 289 F.3d 373, 375 (5th Cir. 2002).

When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a motion for summary judgment by resting on its pleadings. The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim. *Johnson v. Deep E. Texas Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 305 (5th Cir. 2004). The nonmovant must do more than show that there is some metaphysical doubt as to the material facts. *Armstrong v. Am. Home Shield Corp.*, 333 F.3d 566, 568 (5th Cir. 2003).

In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Calbillo v. Cavender Oldsmobile, Inc.*, 288 F.3d 721, 725 (5th Cir. 2002); *Anderson*, 477 U.S. at 255. "Rule 56 '*mandates* the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (quoting *Celotex*, 477 U.S. at 322).

## III.    Acadia's Motion to Strike

Acadia moves to strike the affidavit of Mark Ryman, SkilllMaster's safety director, from the summary judgment evidence. (Docket Entry No. 23). Acadia argues that Ryman contradicts his earlier deposition testimony; that Ryman lacks personal knowledge about the business dealings between SkillMaster and Acadia; and that the affidavit is conclusory and states legal conclusions. (*Id.* at 7–8).

In his affidavit, executed on November 18, 2005, Ryman stated that he is employed by SkillMaster. (Docket Entry No. 19, Ex. 1). In his deposition, taken on July 18, 2005, Ryman testified that SkillMaster has been acquired by Talent Tree and that he is now working for Talent Tree, although he does "handle some of the lingering issues with Skillmaster." (Docket Entry No. 23, Ex. 2 at 5). Conflicts between deposition testimony and subsequent affidavits or declarations are resolved in favor of the deposition testimony unless the conflict is explained. *Valleza v. City of Laredo, Tex.*, 331 F. Supp. 2d 579, 582–83 (S.D. Tex. 2004) (quoting *S.W.S. Erectors v. Infax, Inc.*, 72 F.3d 489, 495 (5th Cir. 1996) ("[T]his

court does not allow a party to defeat a motion for summary judgment using an affidavit that impeaches, without explanation, sworn testimony.")).  Because Ryman is working for a direct successor of SkillMaster and testified in his deposition that he continues to perform SkillMaster work, there is no contradiction that requires disregarding or striking the affidavit.

Acadia also points to Ryman's deposition testimony that he had no dealings with Clipper before Morales's accident and that, after Talent Tree's acquisition of SkillMaster, he gave the Morales file to Ward Rivenburg, SkillMaster's chief financial officer.  (Docket Entry No. 23, Ex. 2 at 18–19).  In his affidavit, Ryman stated that he was aware of the facts about the general placement of SkillMaster employees with Clipper and  about the specific placement of Morales with Clipper "from personal experience, the performance of [his] various job functions for SkillMaster and from [his] review of the [relevant timecards]." (Docket Entry No. 19, Ex. 1).  The affidavit does not contradict the earlier deposition testimony because Ryman states that his knowledge is in part based on a review of relevant documents and he describes the basis for his knowledge of the subjects he addressed in his affidavit.  *See Diamond Offshore Co. v. A & B Builders, Inc.*, 302 F.3d 531, 544 n.13 (5th Cir. 2002) (holding that "based on [affiant's] personal knowledge and his position with [the company], it was not an abuse of discretion for the district court to consider the information contained in the affidavits," when the affiant described his management position and stated that he had personal knowledge of the facts and had reviewed the company's records pertaining to the affidavit).

This court does not rely on the portions of Ryman's affidavit that state legal

conclusions in deciding the motion for summary judgment. Acadia's motion to strike Ryman's affidavit is denied.

## IV.    SkillMaster's Negligence Claims

### A.    Morales's Status as an Acadia Employee

"[A] workers' compensation carrier is entitled to the right to reimbursement from the first monies paid to an injured employee or his representatives by a third-party tortfeasor, up to the amount of compensation paid, and can recover the amount from the employee or the third-party tortfeasor." *Houston Gen. Ins. Co. v. Campbell*, 964 S.W.2d 691, 695 (Tex. App. – Corpus Christi 1998, writ denied) (citations omitted). "[T]here is but one cause of action against the third party tortfeasor; that of the employee, who owns it burdened by the right of the insurance carrier to recoup itself for compensation paid." *Id.* (citation omitted).

Acadia had a workers' compensation policy in place when Morales was injured. (Docket Entry No. 18, Ex. 5). Acadia argues that SkillMaster cannot recover the benefits paid to Morales because he was Acadia's employee. Section 408.001 of the Texas Workers' Compensation Act bars an injured employee covered by workers' compensation insurance from recovering for negligence against his employer except under circumstances not present here. *Id.* § 408.001.[1]

---

[1]Section 408.001 provides:

(a) Recovery of workers' compensation benefits is the exclusive remedy of an employee covered by workers' compensation insurance coverage or a legal beneficiary against the employer or an agent or employee of the employer for the death of or a work-related injury sustained by the employee.

SkillMaster argues that the workers' compensation bar does not apply because Morales was not Acadia's employee. (Docket Entry No. 19 at 8). The Texas Workers' Compensation Act defines "employer" as follows:

> "Employer" means, unless otherwise specified, a person who makes a contract of hire, employs one or more employees, and has workers' compensation insurance coverage. The term includes a governmental entity that self-insures, either individually or collectively.

Tex. Lab. Code Ann. § 401.011(18). A worker may have more than one "employer" for the purpose of the Workers' Compensation Act. In *Wingfoot Enterps. v. Alvardo*, 111 S.W.3d 134 (Tex. 2003), which, like the present case, involved a worker assigned by a temporary staffing agency to work at a factory owned by one of the agency's clients, the Texas Supreme Court held that "the Act's decided bias in favor of employers electing to provide coverage for their employees supports [the] conclusion that the Act permits more than one employer for workers' compensation purposes." The court explained:

> An employee injured while working under the direct supervision

_____

(b) This section does not prohibit the recovery of exemplary damages by the surviving spouse or heirs of the body of a deceased employee whose death was caused by an intentional act or omission of the employer or by the employer's gross negligence.

(c) In this section, "gross negligence" has the meaning assigned by Section 41.001, Civil Practice and Remedies Code.

(d) A determination under Section 406.032, 409.002, or 409.004 that a work-related injury is noncompensable does not adversely affect the exclusive remedy provisions under Subsection (a).

Tex. Lab. Code Ann. § 408.001.

> of a client company is conducting the business of both the
> general employer and that employer's client.  The employee
> should be able to pursue workers' compensation benefits from
> either.  If either has elected not to provide coverage, but still
> qualifies as an "employer" under the Act, then that employer
> should be subject to common law liability without the benefit of
> the defenses enumerated in section 406.033.

*Id.* at 143.  The test is whether the employer has the right to control the "progress, details,

and methods of operations of the employee's work."  *Thompson v. Travelers Indem. Co. of*

*Rhode Island*, 789 S.W.2d 277, 278 (Tex. 1990); *St. Joseph Hosp. V. Wolff*, 94 S.W.3d 513

(Tex. 2003).

In *Wingfoot*, the jury found that the staffing agency's client controlled the details of

the injured employee's work, but the Texas Supreme Court held that the staffing agency was

also an "employer" protected by the exclusive-remedy provision of section 408.001.  *Id.* at

134–36.  In *Garza v. Excel Logistics, Inc.*, 161 S.W.3d 473 (Tex. 2005), the Texas Supreme

Court examined a related situation.  The employee in that case conceded that the temporary

employment agency was his employer when he was injured, but disputed that the agency's

client—which had workers' compensation insurance—was also his employer.  *Id.* at 476.

The court held that both could be the employee's employers and that traditional indicia, such

as the exercise of actual control over the details of the work that gave rise to the injury,

would determine whether an employee of a staffing agency was also an employee of the

client company for the purpose of the Workers' Compensation Act.  161 S.W.3d at 477.

SkillMaster argues that its contract with Acadia specified that SkillMaster had the

right to control Morales's work.  (Docket Entry No. 19 at 8).  Under Texas law, if a contract

9

expressly determines the right to control an employee, the party with the "right to control" the employee is the employer for the purpose of the Texas Workers' Compensation Act. *Producers Chem. Co. v. McKay*, 366 S.W.2d 220, 226 (Tex. 1963); *Tex. Prop. & Cas. Guar. Ass'n v. Nat'l Am. Ins. Co.*, No. 03-05-00401, 2006 WL 821068, at *13 (Tex. App.–Austin March 31, 2006, no pet. filed).  "When a contract, written or oral, between two employers expressly provides that one or the other shall have right of control, solution of the question is relatively simple." *McKay*, 366 S.W.2d at 226.  The court in *McKay* referred to two cases as providing examples of contracts addressing the right of control.  In the first case, *Magnolia Petroleum Co. v. Francis*, 169 S.W.2d 286, 286 (Tex. Civ. App. 1943, *writ refused*), the contract provided:

> Contractor hereby agrees to furnish the labor, equipment, implements, teams, trucks and all things necessary for and to do and perform the work and services hereinafter set out as an independent contractor, free of control or supervision of Company as to means and method of performing the same; that all persons engaged in the performance of said work or service shall be solely the servants or employees of Contractor; that Contractor shall carry Employers' Liability or Workmen's Compensation insurance covering all persons performing such work or service, and carry Public Liability insurance covering the classes of work done and all motor equipment used hereunder, all in amounts and under policies examined, approved and accepted by Company.

*Id.* at 286–87.  In the second case, *Steele v. Wells*, 134 S.W.2d 377, 378 (Tex. Civ. App. 1939, writ refused), the contract stated:

> Under the contract [the employer] had the exclusive right to control the manner in which [the worker] operated the truck in question while performing the duties of the special employment.

10

> This included instructions and supervision as to the manner in which the workers were to be loaded on the truck, the place they were to be transported to, the route to be traveled, and the speed at which the truck was to be operated.  The truck owner [ ] had no right of control with respect to such matters.

*Id.* at 378.

The contract SkillMaster invokes was printed on individual workers' time cards.  (*See* Docket Entry No. 19, Exs. 3, 4).  The card front was a daily time record on which each employee was to fill in the time worked each day.  (*Id.*).  Acadia then signed the card to verify the time worked.  (*Id.*).  Sharon Malone, the former Purchasing, Shipping, and Human Resources Manager for J.M. Clipper, signed Morales's time cards.  (Docket Entry No. 18, Ex. 6).  The front of the time card, directly above the place that Malone signed, included the following language:

> CUSTOMER AGREEMENT: PLEASE READ THIS AND CUSTOMER AGREEMENT ON REVERSE SIDE BEFORE SIGNING
>
> 1)  Customer agrees that the "Regular Hours" and "Overtime Hours" on this time sheet are correct and should be paid to the employee by SkillMaster and billed to Customer.  Customer further agrees to pay for these hours upon receipt of SkillMaster's invoice.
>
> 2)  Customer agrees that all hours over 40, or those approved as overtime, should be paid to the employee by SkillMaster and billed to Customer at 1 ½ times the regular hourly rate.
>
> 3)  Customer agrees that the utilization of the above named person on either a temporary or direct hire basis within one year from the date of the last time sheet will be through SkillMaster. If the client company desires to hire this person on a direct hire basis, it is on SkillMaster's payroll for a period of 520 hours

from the date of notification, or the client will pay the standard
SkillMaster employment fee.

4)  The undersigned is the authorized agent of the Customer.

(Docket Entry No. 19, Ex. 3).  The reverse side of the time card contains the "Customer

Agreement," which states:

By signing this time sheet, the Customer's Representative (1)
clarifies that the hours on the reverse side are correct and that
the work was performed in a satisfactory manner; (2) confirms
prior agreement between SkillMaster and Customer, with
respect to the services performed hereunder and any future
services, that (a) Customer shall not entrust SkillMaster
employees with unattended, premises, cash, negotiable or other
valuables or authorize such employees to operate machinery or
motor vehicles without the prior written permission from
SkillMaster in each instance; (b) SkillMaster's insurance does
not cover loss or damage caused by SkillMaster employees
operating customer's owned or leased motor vehicle(s), and
Customer therefore accepts full responsibility for claims,
including the defense thereof, involving bodily injury, property
damage, fire, theft, collision, cargo damage or public liability
damage sustained or incurred as a result of a SkillMaster
employee driving such vehicle(s), or arising out of or involving
violation by Customer of paragraph (2) (a) above; (c)
SkillMaster is not responsible for claims made under its Fidelity
Bond unless such claims are reported in writing to it by
Customer within 10 days after occurrence; (d) Customer shall
defend, indemnify and save SkillMaster harmless from any and
all fines, penalties, and assessments, including attorneys' fees,
incurred by SkillMaster as a result of any alleged violations of
any Federal, State or local law, regulation or ordinance relating
to health and safety with respect to premises owned or
controlled by Customer and to which SkillMaster employees are
assigned.  The customer recognizes SkillMaster's employer-
employee relationship with its personnel and accepts the
obligation to discuss all matters concerning their employment,
job assignments, pay procedures, etc., with SkillMaster.

(*Id.*).

This contract does not speak to whether SkillMaster or Acadia had the right to control Morales's work.  The last sentence of the "Customer Agreement" stated that SkillMaster has an employer/employee relationship with the worker—Morales—but that does not preclude Acadia's status as Morales's employer or Morales's status as Acadia's employee.

Unlike the contracts in the *Magnolia Petroleum* and *Steele* cases cited in *Producers Chemical Company v. McKay*, the contract language on which SkillMaster relies does not discuss the right to control how workers complete their tasks.  The contract language does not specify that Acadia was to discuss with SkillMaster the details of how workers performed their job.  As the Fifth Circuit has stated, "[i]f the parties to the Agreement wanted [one party] to have exclusive control over the [employees], they could have provided such a provision in the Agreement."  *Starnes*, 139 F.3d at 542.  The customer agreement does not address the right of control and does not determine whether Morales was employed by both Acadia and SkillMaster for the purpose of the workers' compensation bar.[2]

When a contract does not address the right to control an employee's manner and detail of work, a court must examine the facts and circumstances disclosed in the record to make the determination. *McKay*, 366 S.W.2d at 226.  For Morales to be Acadia's borrowed employee, Acadia must have "the right to direct and control [him] with respect to the details of the particular work at issue."  *St. Joseph*, 94 S.W.3d at 537; *Marshall v. Toys-R-Us Nytex,*

---

[2] As a result, this court does not address Acadia's argument that Malone did not have the authority to enter the Customer Agreement.

*Inc.*, 825 S.W.2d 193, 196 (Tex. App.–Houston [14th Dist.] 1992, writ denied).  Examples of the type of control normally exercised by an "employer" include "when and where to begin and stop work, the regularity of hours, the amount of time spent on particular aspects of the work, the tools and appliances used to perform the work, and the physical method or manner of accomplishing the end result." *Thompson*, 789 S.W.2d at 279 (citations omitted); *see also Ruiz v. Shell Oil Co.*, 413 F.2d 310, 312–13 (5th Cir. 1969) (listing nine factors to consider in determining whether an entity acted as a worker's "employer"); *Stephens v. Witco Corp.*, 198 F.3d 539, 542 (5th Cir. 1999) (analyzing the nine *Ruiz* factors).

SkillMaster does not dispute the facts that Acadia argues as evidence of its control over Morales's work.  SkillMaster instead argues that "[s]uch facts [ ] are of no consequence because the agreement between Clipper and SkillMaster provides that SkillMaster has the right to control the employee."  (Docket Entry No. 19 at 9).  As noted, the record does not support this argument.  John Martin, a former Acadia shift supervisor, testified that he trained Morales and told him what his shift time and job duties would be.  (Docket Entry No. 18, Ex. 3 at 2).  Martin testified as follows:

> I took him to the TDI area in the plant, told him that he would be working there and that he would be required to report to the TDI area of the plant at the beginning of his shift.  He was advised that he would be given instruction by J.M. Clipper each evening he reported to work, on his job duties for that evening. . . . J.M. Clipper set the hours that Mr. Morales would have to work on his shift at the plant, set the time when he was allowed to take breaks, and set the length of the break times. . . . I also showed him how a gasket is manufactured on the J.M. Clipper presses and how to run a press.

14

J.M. Clipper decided which press or machine was to be operated and assigned individuals, including Mr. Morales, to work on a particular machine.  J.M. Clipper always controlled the details on how the machines were to be run.  All the tools, equipment, raw materials and parts that were to be used in doing the work in the TDI room where Mr. Morales worked were provided by J.M. Clipper.  All the required safety equipment and safety glasses for performing work in our plant were provided by J.M. Clipper.  All J.M. Clipper employees, including Mr. Morales were required to follow all the rules and policies of J.M. Clipper in regards to the work performed in the TDI room.  All of the orders, directions and instructions for doing the work came from J.M. Clipper.  The original instructions and specifications always came from a J.M. Clipper supervisor.

J.M. Clipper specified the machines on which the particular gaskets were to be made and specified the manner in which the individual press machines were to be operated.  Mr. Morales was assigned to work at a particular press or machine in the TDI area.  Mr. Morales could not change the press or machine he was working on without direction from J.M. Clipper. . . . J.M. Clipper made the decision on what type of gaskets to be made, on what machines the gaskets were to be made and how the gaskets were to be made.  The written work orders issued and posted by J.M. Clipper dictated the size, quantity and type of part to be made.  Each shift in the TDI area would either receive verbal instructions from a J.M. Clipper supervisor on the work to be performed during the shift or would obtain that information from the written work orders posted for that shift by J.M. Clipper in the TDI area.

(*Id.* at 2–3).  Martin testified that there "were never any Skillmaster supervisors or foreman at the plant to supervise or control the activities of Mr. Morales, in any way."  (*Id.* at 3).

Charles Courtney, the former night supervisor at the plant, similarly testified that he supervised the details of Morales's work.  (Docket Entry No. 18, Ex. 4).  Courtney testified:

On the evening of his accident, on November 19, 2003, I had specifically directed Mr. Morales to work on auto press no. 2

15

and to make gaskets pursuant to a J.M. Clipper work order. He
was working on this machine, performing the work I had
directed him to perform, when he had his accident.

(*Id.* at 2). SkillMaster argues that Acadia lacked the right to control the details of Morales's

work, but the evidence that Acadia exerted actual control is uncontroverted.

In *Wingfoot,* the Texas Supreme Court noted that "there was summary judgment

evidence that [the client company] controlled the details of [the employee's] work at the time

of her injury," even though the staffing agency was responsible for hiring, screening, and

terminating employees sent to the client company, for paying the employees' salaries,

unemployment taxes, social security taxes, and for withholding federal income taxes, for

giving the employees details about their job assignments, and for providing basic safety

equipment and training. In *Wingfoot,* the staffing company had supervisors at the client's

premises to check employees in, get them started working, issue them proper safety

equipment, and monitor their breaks and lunch hours. 111 S.W.3d at 135. The client

company in *Wingfoot* supervised the specific tasks temporary employees performed, but the

temporary-staffing agency retained the right to determine which employees performed

specific tasks at the factory and could substitute different employees to perform particular

tasks or reassign an employee to another task. *Id.* The Texas Supreme Court found that the

temporary agency and client company were dual employers, despite evidence that the staffing

agency had extensive control over certain aspects of the employee's work. *Id.*

In *Garza*, the Texas Supreme Court held that an injured worker was an employee of

the temporary-staffing agency's client because he was working on the client's premises when

16

injured, in furtherance of the client's day-to-day business, and the client specifically directed the details of the work that caused his injury.  161 S.W.3d at 477.  The *Garza* court reached this conclusion even though the employee testified that he was sometimes supervised—including given instructions as to what to do and how to do it at the job site—by an employee of the temporary-staffing agency.  *Id.*

The undisputed summary judgment evidence in the present case shows that SkillMaster exerted less control over Morales than the temporary agencies in *Wingfoot* or in *Garza* exerted over the injured employees in those cases.  There is no evidence that at Acadia, SkillMaster controlled what machine Morales worked on, the details of his work, or the hours he worked.  The undisputed summary judgment evidence in the present case shows that when he was injured, Morales was working at the Acadia plant, on an Acadia machine, at the direction of an Acadia supervisor, to make a part specified by Acadia, in furtherance of Acadia's day-to-day business.  As a matter of law, Morales was an Acadia as well as a SkillMaster employee for the purpose of the Workers' Compensation Act.  Section 408.001 applies.

### B.     The Limits of the Texas Workers' Compensation Bar

Section 417.004 of the Texas Labor Code provides:

> In an action for damages brought by an injured employee, a legal beneficiary, or an insurance carrier against a third party liable to pay damages for the injury or death under this chapter that results in a judgment against the third party or a settlement by the third party, the employer is not liable to the third party for reimbursement or damages based on the judgment or settlement unless the employer executed, before the injury or death

> occurred, a written agreement with the third party to assume the
> liability.

Tex. Lab. Code Ann. § 417.004.  Under this statute, employers who subscribe to workers'

compensation insurance are immune from liability to third parties the employee might sue

for his injuries.  *Whiteco Metrocom, Inc. v. Tex. Utils. Elec. Co.*, 30 S.W.3d 421, 423 (Tex.

App.–Dallas 2000, pet. denied).

SkillMaster argues that this provision does not bar its claims against Acadia even if

Morales was Acadia's employee because of the indemnity agreement with Acadia.  (Docket

Entry No. 19 at 13).  The customer agreement provided on the back of each time card stated,

in relevant part:

> Customer shall defend, indemnify and save SkillMaster
> harmless from any and all fines, penalties, and assessments,
> including attorneys' fees, incurred by SkillMaster as a result of
> any alleged violations of any Federal, State or local law,
> regulation or ordinance relating to health and safety with respect
> to premises owned or controlled by Customer and to which
> SkillMaster employees are assigned.

(Docket Entry No. 19, Ex. 3).

Indemnity agreements are construed to give effect to the parties' expressed intent.

*Ideal Lease Serv. v. Amoco Prod. Co.*, 662 S.W.2d 951, 953 (Tex. 1983); *Crowder v.*

*Scheirman*, No. 01-04-00173, 2005 WL 3118413 (Tex. App.–Houston [1st Dist.] Nov. 23,

2005, no pet. filed).  Whether a contract is unambiguous and what an unambiguous contract

means are legal questions.  *Interstate Contracting Corp. v. Dallas, Tex.*, 407 F.3d 708, 712

(5th Cir. 2005).  The provision at issue requires Acadia to indemnify SkillMaster from all

18

"fines, penalties, and assessments" it incurred "as a result of any alleged violations of any Federal, State or local law, regulation or ordinance relating to health and safety with respect to premises owned or controlled by [Acadia]. . . ."  SkillMaster has not alleged that it has been fined or required to pay any penalties as a result of violations of Federal, State, or local laws, regulations, or ordinances.  Rather, SkillMaster seeks indemnity for benefits it paid to Morales as a result of Acadia's alleged negligence.  (Docket Entry No. 1, Ex. 1).  The contract does not extend indemnity for such payments.

The cases SkillMaster cites involve broader indemnity language than the agreement in this case.  *See, e.g.*, *Houston Lighting & Power Co. v. Atchison, Topeka & Santa Fe Ry. Co.*, 890 S.W.2d 455,  455 (Tex. 1994) (construing an indemnity agreement that provided, "HL & P agrees that it will at all times indemnify and save harmless Railway Company against all claims, demands, actions or causes of action, arising or growing out of loss of or damage to property, including said rotary dumper and appurtenances, and injury to or death of persons, including employees of Railway Company, resulting in any manner from the construction, maintenance, use, state of repair or presence of said rotary dumper and appurtenances under or adjacent to The Track, whether such loss, damage, injury or death be caused or contributed to by the negligence of Railway Company, its agents or employees, or otherwise. . . .").  Assuming, without deciding, that the Acadia employee who signed the time cards had the authority to bind Acadia to the indemnity provision set out in those cards, the provision does not require Acadia to indemnify SkillMaster for payments to Morales made as a result of Acadia's negligence.

19

**V.     SkillMaster's Claims Other Than Negligence**

SkillMaster argues that even if Acadia was Morales's employer when he was injured, its claims other than for negligence are not barred.  (Docket Entry No. 19 at 9).  SkillMaster argues that Acadia's use of Morales as a machine operator rather than as a general laborer breached the agreement between SkillMaster and Acadia.  (Docket Entry No. 1, Ex. 1; Docket Entry No. 19 at 10).  SkillMaster alleges as damages the difference in rates charged for a general laborer and for a machine operator.  (Docket Entry No. 1, Ex. 1; Docket Entry No. 19 at 10).  SkillMaster argues that Acadia's statements about Morales's work are fraudulent and negligent misrepresentations.  (Docket Entry No. 1, Ex. 1; Docket Entry No. 19 at 11).  SkillMaster also argues that Acadia was unjustly enriched because SkillMaster charged the general laborer rate but Acadia used Morales as a machine operator.  (Docket Entry No. 1, Ex. 1; Docket Entry No. 19 at 11).  Acadia does not address SkillMaster's breach of contract and related claims in its summary judgment motion, arguing only that the claims arising from Morales's injury are barred by section 417.004.  Acadia does not address SkillMaster's contention that the contract and related fraud claims would have existed even if Morales had never been injured.  Section 417.004 limits the immunity it provides to "reimbursement or damages" resulting from a "judgment or settlement" with an injured employee.  Tex. Lab. Code Ann. § 417.004.  Summary judgment as to the nonnegligence claims is denied.

## VI.    Conclusion

Acadia's motion to strike Mark Ryman's affidavit is denied.  Acadia's motion for summary judgment is granted as to SkillMaster's claims for negligence but denied as to SkillMaster's claims against Acadia for breach of contract, fraud, negligent misrepresentation, and unjust enrichment.

SIGNED on April 28, 2006, at Houston, Texas.

_____

Lee H. Rosenthal
United States District Judge